1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7
8
9
10
11
12

| | |
|---|---|
| WEIMIN CHEN, | CASE NO. 2:21-cv-00370-RSM |
| Plaintiff, | ORDER GRANTING DEFENDANTS' MOTION TO DISMISS |
| v. | |
| SUR LA TABLE, INC., *et al.*, | |
| Defendants. | |

13
14

## I.       INTRODUCTION

15

        This matter comes before the Court on Defendants SLT Holdco, Inc., SLT Lending SPV,

16

Inc., SLT IP Holdings, LP, and CSC Generation Holdings, Inc. ("SLT")'s Motion to Dismiss,

17

Dkt. # 8.  For the reasons stated below, the Court GRANTS SLT's Motion and DISMISSES the

18

case as to the four moving Defendants with leave to amend.

19

## II.       BACKGROUND

20

        On February 24, 2021, Plaintiff Weimin Chen filed this two-count class action in King

21

County Superior Court, alleging that Defendant Sur La Table, Inc., had violated the Washington

22

Commercial Electronic Mail Act ("CEMA") and the Washington Consumer Protection Act

23

("CPA") by transmitting at least 22 commercial emails with purportedly false or misleading

24

information in their subject lines to Mr. Chen and other consumers.  Dkt. # 1 ¶ 3.

ORDER – 1

On March 10, 2021, Mr. Chen filed the operative First Amended Complaint ("FAC"), which added five John Doe Defendants and the four moving Defendants: SLT Holdco, Inc., SLT Lending SPV Inc., SLT IP Holdings, LP, and CSC Generation Holdings, Inc.   Dkt. #1-2. According to Mr. Chen, Sur La Table is a Washington-based kitchenware and dinnerware retailer that operates approximately 130 stores throughout North America (including at least two locations in Washington State) as well as an online store at www.surlatable.com.  *Id.* ¶ 14.  Mr. Chen alleges that Sur La Table conducts its business through various business entities, which include Sur La Table, Inc., SLT Holdco, Inc., SLT Lending SPV, Inc., SLT IP Holdings, LP, CSC Generation Holdings, Inc., and the John Doe Defendants (together, "Sur La Table").  *Id.* ¶ 8–9.

Mr. Chen's FAC alleges that Sur La Table sent, or participated in the sending of, marketing emails to consumers with subject lines that falsely or misleadingly indicated that the person could receive a specified percentage-off discount on their entire purchase or on one item of their choosing.  *Id.* ¶ 16.  The subject lines of the emails included language, such as: "xx% Off Your Purchase," "xx% Off Your Order," or "xx% Off One Item."  *Id.*  An image of one such email purportedly transmitted by Sur La Table to Plaintiff on January 26, 2021, was included in the FAC:

**From:** Sur La Table <sur_la_table@email.surlatable.com>
**To:** ████████████████████████
**Sent:** Tuesday, January 26, 2021, 06:07:23 AM PST
**Subject:** See what's new—and take 20% off your order!

*Id.* at 7. Mr. Chen's FAC alleges that Sur La Table's subject lines are false or misleading in that "[a]n ordinary consumer would understand these statements of 'xx% Off Your Purchase,' 'xx% Off Your Order,' or 'xx% Off One Item' to mean that Sur La Table was offering a percentage-

ORDER – 2

off discount from its regular selling prices for all of its products," when, allegedly approximately 25% of its products—including its most popular products—were excluded from the advertised sale. *Id*. ¶ 19 (emphasis removed); *see also id*. ¶¶ 18, 20–22, 31–33, 36–40.

On March 18, 2021, SLT removed this action to this Court pursuant to 28 U.S.C. §§ 1332, 1441, 1446, 1453 and Fed. R. Civ. P. 81(c), asserting original federal jurisdiction under 28 U.S.C. §§ 1332(d)(2) and 1453(b).  Dkt. #1.

On March 25, 2021, SLT moved to dismiss Mr. Chen's FAC for failure to state a claim ("Motion").  Dkt. #9.  Mr. Chen filed a response opposing the Motion, SLT filed a reply, and subsequently Mr. Chen filed a sur-reply.  Dkts. #10–12.

## III.     DISCUSSION

### A.  Legal Standard

Dismissal under Federal Rule of Civil Procedure 12(b)(6) "can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990); *see also* FED. R. CIV. P. 8(a)(2).  While considering a Rule 12(b)(6) motion, the court accepts all facts alleged in the complaint as true and makes all inferences in the light most favorable to the non-moving party. *Baker v. Riverside Cnty. Office of Educ.*, 584 F.3d 821, 824 (9th Cir. 2009) (citations omitted). The court is not required, however, to accept as true a "legal conclusion couched as a factual allegation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679 (citations omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.* at 678 (quoting

*Twombly*, 550 U.S. at 570).  This requirement is met when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (quoting *Twombly*, 550 U.S. at 556).  The complaint need not include detailed allegations, but it must have "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. . . . Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556, 557).  Absent facial plausibility, a plaintiff's claims must be dismissed.

**B. Washington's Commercial Electronic Mail Act Claim**

CEMA prohibits the sending of commercial electronic mail messages that either:

(a) Uses a third party's internet domain name without permission of the third party, or otherwise misrepresents or obscures any information in identifying the point of origin or the transmission path of a commercial electronic mail message; or
(b) Contains false or misleading information in the subject line.

RCW 19.190.020(1).  Mr. Chen asserts that SLT violated subsection (b).  Dkt. #1-1 ¶ 56.  SLT contends that the subsection prohibits subject lines only when they are false or misleading as to the commercial nature of the email.  If SLT's interpretating of subsection (b) is accepted, Mr. Chen fails to state a claim for CEMA.

SLT argues its interpretation is consistent with (i) the statutory text of CEMA and Washington's overall statutory scheme; (ii) the legislative history of CEMA; (iii) the interpretation afforded CEMA by Washington's Attorney General; (iv) caselaw interpreting CEMA and other similar statutes; and (v) the intent of anti-spam legislation nationwide.  Mr. Chen responds that SLT's interpretation of CEMA artificially narrows the statute by inserting

additional language such that the provision would read: "[c]ontains false or misleading information in the subject line *regarding the commercial nature of the email*." Dkt. #10 at 12 (emphasis in original).

When interpreting a state statute, a federal court must interpret the law as would the state's highest court. *See In re Kolb,* 326 F.3d 1030, 1037 (9th Cir.2003). In Washington, the Court begins with the plain language of the statute, assuming that the legislature "meant exactly what it said." *Duke v. Boyd,* 133 Wash.2d 80, 942 P.2d 351, 354 (1997). However, if the statute is ambiguous, the Court may consider legislative history and the "circumstances surrounding the enactment of the statute." *Five Corners Family Farmers v. State,* 173 Wash.2d 296, 268 P.3d 892, 900 (2011). A statute is ambiguous if it is susceptible to two or more reasonable interpretations. *Id.* Finally, "statutes should be construed to effect their purpose, and unlikely, absurd or strained consequences should be avoided." *Ski Acres, Inc. v. Kittitas Cnty.*, 118 Wash. 2d 852, 857, 827 P.2d 1000, 1004 (1992).

The Court first looks to the plain language of subsection (b): "Contains false or misleading information in the subject line." RCW 19.190.020(1)(b). CEMA does not define the word "information," so we begin with the word's plain meaning. The plain and ordinary meaning of the term "information" is "knowledge obtained from investigation, study, or instruction." https://www.merriam-webster.com/dictionary/information. The parties do not dispute that the "information" at issue for purposes of CEMA analysis is conveyed via the subject line, but the parties do dispute the scope of what false or misleading information can trigger CEMA. SLT argues that CEMA only prohibits false or misleading information in email subject lines as to the "commercial nature" of the email, i.e., what is communicated via the header of the email which includes the "To:," "From:," "Sent:" or date, and "Subject:" lines. Dkt. #8 at 6. Mr. Chen argues that CEMA prohibits any false or misleading information in an email subject line, not only as to

1   the commercial nature of the email, but also as to the content of the email.  Dkt. #10 at 21.  The

2   Court finds both parties' interpretations of CEMA are reasonable—CEMA could apply to false

3   and misleading "knowledge obtained from the investigation, study or instruction" of the header

4   alone (nature of the email) or it could apple to false and misleading "knowledge obtained from

5   the investigation, study or instruction" of the header *and* body of the email (contents of the email).

6          Since there is more than one reasonable interpretation of subsection (b), the Court turns

7   to the context of the statute, caselaw, and the statute's legislative history.

8          First, SLT argues that read as a whole, CEMA prohibits subject lines with false and

9   misleading information that hides the commercial nature of the email.  Dkt. #8 at 6.  Specifically,

10  the Court must read the words of the statute together and give them a related meaning.  *Id.* (citing

11  *Aguayo v. U.S. Bank*, 653 F.3d 912, 927 (9th Cir. 2011) ("Generally, all the words used in a list

12  should be read together and given related meaning when construing a statute or regulation.");

13  *Garza v. AMTRAK*, 418 F. Supp. 3d 644, 653 (W.D. Wash. 2019) ("A related canon, *ejusdem*

14  *generis* teaches that general words following a list of specific words should usually be read in

15  light of those specific words to mean something similar.").   Here, CEMA includes a list of

16  prohibited practices. The prohibition on "false or misleading information in the subject line," in

17  subsection (b), follows a prohibition in subsection (a) on using a third party's internet domain

18  name without its permission or using a domain name that obscures the sender of the email.  SLT

19  argues that read as a whole and in context, the prohibition on "false or misleading information in

20  the subject line" should similarly be read to prohibit "false or misleading information" that

21  obscures the commercial nature of the email.  Thereby the two provisions—subsections (a) and

22  (b)—would be given similar scope with subsection (a) prohibiting subject lines and email

23  addresses concealing the sender's identity, and subsection (b) prohibiting subject lines

24  concealing the fact that the email is in fact an advertisement.

ORDER – 6

In response, Mr. Chen argues that this canon of construction applies to words in a list and not subsections of a statute. Dkt. #10 at 13. Instead, Mr. Chen points to *Cerrillo v. Esparza*, 158 Wn. 2d 194 (2006), in which the Washington Supreme Court rejected respondents' argument that three subsections of a statute be read together. The Washington Supreme Court explained that if the legislature had wanted to limit the other two subsections in the same way as the first one, the "legislature could have included similar language in each of the subsections" or placed the limiting language in the section preceding the three subsections. 158 Wn. 2d at 204. However, because the legislature did not do either of these things, the court "must interpret the statute as written and not add or move language, even if we believe the legislature intended a different result." *Id.* at 204.

On reply, SLT maintains that the relevant canons of construction may apply to phrases, concepts, and subsections more generally and not just lists. Dkt. #11 at 4 (citing *Department of Ecology v. Campbell Gwinn*, 146 Wn. 2d 1, 11 (2002) ("[T]he plain meaning is still derived from what the Legislature has said in its enactments, but that meaning is discerned from all that the Legislature has said in the statute and related statutes which disclose legislative intent about the provision in question."); *C.J. C. v. Corp. of the Catholic Bishop of Yakima*, 138 Wn.2d 699, 708-09 (1999) ("We construe an act as a whole, giving effect to all the language used. Related statutory provisions are interpreted in relation to each other and all provisions harmonized."); *ITT Rayonier, Inc. v. Dalman*, 122 Wn.2d 801, 807 (1993) ("Statutory provisions must be read in their entirety and construed together, not piecemeal.")). Further, SLT points out, the preamble and subsections (a) and (b) of CEMA are a single sentence when read together.

Second, SLT argues that CEMA's statutory text must be read in the context of the overall statutory scheme. Dkt. #7 at 7 (citing *Rudel v. Haw. Mgmt. All. Ass'n*, 937 F.3d 1262, 1272 (9th Cir. 2019) ("Employing the familiar tools of statutory interpretation, we begin with the plain language of the statute, reading the words in the context of the overall statutory scheme."); *Carpenters Health & Welfare Tr. Funds v. Robertson*, 53 F.3d 1064, 1067 (9th Cir. 1995) ("When we look to the plain

language of a statute in order to interpret its meaning, we do more than view words or sub-sections in isolation. We derive meaning from context, and this requires reading the relevant statutory provisions as a whole."); *Coulombe v. Total Renal Care Holdings, Inc*., No. C06-504JLR, 2007 U.S. Dist. LEXIS 7766, at *13 n.6 (W.D. Wash. Feb. 2, 2007) ("[I]n ascertaining intent from statutory language, the provision at issue must be evaluated in the context of the entire statute.")).  Here, SLT argues, because the Washington Consumer Protection Act, RCW 19.86.020 ("CPA"), Washington's general consumer protection act, prohibits false advertising and consumer fraud and applies to advertising wherever made, CEMA cannot be interpreted to replace this general false advertising scheme with respect to representations made in email subject lines.  If that were the case, CEMA would elevate advertising in a subject line and punish it more severely than advertising anywhere else.  CEMA is instead aimed at curbing unlawful spam.  In this context, CEMA is best interpreted to apply only when the subject line is "false or misleading" with respect to the commercial nature of the email.  In that way, it allows consumers to identify an email advertisement as an email advertisement, allowing them to freely choose whether or not to open it.  Dkt. #8 at 7–8.

In response, Mr. Chen argues that the CPA is a broad statute that prohibits all "unfair and deceptive practices," and that the Washington legislature has subsequently enacted numerous other statutes that prohibit some form of false advertising or the making of false representations.  Dkt. #10 at 15 (citing *e.g.* (RCW 46.70.180(1) (false or misleading representations related to motor vehicle sales); RCW 19.170.010 (deceptive promotional advertising of prizes); RCW 19.178.100 (false advertising in going-out-of-business sales); RCW 19.138.030 (false advertising by sellers of travel); RCW 19.25.100 (false advertising regarding music); RCW 15.86.030, RCW 19.86.023 (false representations of organic products); RCW 69.90.020 and .030 (false representations of kosher food products)).  As a result, Mr. Chen's interpretations of CEMA would not "replace" CPA but serve as yet another false advertising statute but in the specific context of emails.

On reply, SLT argues that the other statutes Mr. Chen cites prohibiting false advertising in certain contexts prove its point.  In those other statutes, the prohibited wrong is not general false advertising, which is already covered under CPA, but false or misleading information of a specific kind, focused on an area relevant to the purpose of the statute.  Thus, CEMA should also be interpreted in a manner consistent with its focus.

While Washington courts have not yet directly addressed the interpretation of subsection (b), Washington case law does support SLT's interpretation.  In dicta, the Washington Supreme Court, stated the following about CEMA: "[T]he use of false or misleading subject lines. . . hampers an individual's ability to use computer time most efficiently. When spammers use subject lines 'such as Hi There!, Information Request, and Your Business Records,' it becomes 'virtually impossible' to distinguish spam from legitimate personal or business messages." *State v. Heckel*, 143 Wn.2d 824, 829 (2001).  On remand, the intermediate appellate court similarly focused on the fact that the subject lines were misleading about the commercial nature of the email: ""[T]he subject line was clearly designed to entice the recipient to open the message, not with creative advertising . . . , but by enticing the recipient to believe that the message might be from a friend or acquaintance or business contact . . . , rather than a commercial advertisement." *State v. Heckel*, 122 Wn. App. 60, 71, 93 P.3d 189 (2004).  The court concluded that "reasonable minds could not differ with the conclusion that Heckel's two subject lines . . . were deceptive and misleading when the body of the e-mail consisted of an unsolicited advertisement." *Id*.

Mr. Chen in turn cites to *Harbers v. Eddie Bauer*, LLC, 415 F. Supp. 3d 999 (W.D. Wash. 2019), but this case does not discredit SLT's interpretation.  In *Harbers* this court held that an alleged violation of CEMA was sufficient to confer Article III standing, and thus denied plaintiff's motion to remand.  In doing so, the court did not address whether the alleged violations

ORDER – 9

1    were actually violations of CEMA.  Plaintiff then voluntarily dismissed the case.  *See Harbers v.*

2    *Eddie Bauer*, No. 2:19-cv-00968-JLR, Dkt. #31.

3         The Court finds that CEMA's legislative history further supports SLT's interpretation.

4    SLT makes four arguments.  First, SLT argues that the original draft legislation for CEMA

5    banned all unsolicited commercial email advertisements, except those sent to recipients with

6    whom the business had a pre-existing business relationship and, even then, any such email would

7    have needed a subject line that included the word "ADVERTISEMENT."  *See* Dkt. #8-1, Ex. A

8    at 9–12, House Bill ("HB") 2752.  The purpose of the initial bill was to prohibit unwanted spam

9    outright and to make it easy for internet users to identify such advertisements so that they could

10   be avoided or deleted with ease.  That proposal was abandoned, however, based on concerns that

11   it would violate the First Amendment – concerns that were voiced by the senders of email

12   advertisements, the ACLU, and others.  *See infra,* n.4.  Notably, nothing in the original draft

13   reflected a legislative intent to apply general false advertising law more strictly to email subject

14   lines.  To the contrary, Section 1 of the original bill (HB 2752) states: "To the recipient,

15   unsolicited commercial electronic mail messages are often indistinguishable from other

16   electronic mail messages. The unsolicited messages thus diminish the utility of electronic mail

17   service because users must wade through unwanted advertisements to obtain those messages they

18   wish to receive."  *Id.* at 9.

19        Second, SLT argues that when the Washington legislature ultimately enacted CEMA, it

20   did not ban unwanted spam outright or require an "ADVERTISEMENT" label in the subject line;

21   instead, CEMA bars commercial emails that use from lines or subject lines that disguise either

22   the sender of the email or the commercial nature of the email.  The Senate Bill Report on the

23   revised bill (ESHB 2752), which ultimately became CEMA, stated:

24

ORDER – 10

> Some Internet service providers (ISPs) and Internet users report that senders sometimes *disguise advertisements* by putting *false or misleading information on the subject line of the messages*, hide their identifies by using third parties' Internet domain names without permission or otherwise misrepresent the points of origin or transmission paths of messages.

*Id.* at 48 (emphasis added). This same note was included in the report to Washington's Governor regarding the legislation. *Id.* at 51-56.5

Third, SLT argues that written testimony in support of the legislation also underscored that the "fraud" at issue was fraud with respect to the contents of the email, not fraud generally. The testimony of Edward J. McNichol III (*id.* at 25-38) stated:

> The clear majority of junk email is in regards to shady and fringe businesses. Most promote products such as pornographic web sites, chain letters, and such. A prime example is the attached e-mail titled "Make Money Fast . . . IT'S LEGAL TOO!!." This message is clearly a chain letter pyramid scheme and is most likely in violation of state and federal statutes. Most of these messages are sent using false "headers," the Internet's equivalent of a return address. If the recipient replies to the original mail, that new message is frequently sent either to an innocent victim or to a nonexistent address. This then results in system error messages bouncing all about the net. And in most cases, the unsolicited commercial messages appear with deceiving text in the subject field. Topics such as "hi There!", "Information Request" and "Your Business Records" have been used. This deceptive practice makes it virtually impossible to discern junk e-mail from the messages critical to my business. And most junk emails appear numerous times from numerous senders.

*Id.* at 27. Similarly, testimony from Joe C. Daniels (*id.* at 46-47) stated:

> We would suggest that any notice required by this act should appear in a "clear and conspicuous manner" and contain the following information . . . (a) *the advertisement must be readily identifiable as promotion or contain a disclosure that it is an advertisement*. . . .

*Id.* at 46. SLT argues that the proponents of CEMA were not concerned with prohibiting general fraud, but with prohibiting emails that disguised the fact that they were advertisements.

Fourth, CEMA, as originally enacted, created a Select Task Force on Commercial Electronic Messages. *See id.* at 20-24. The purpose of the Task Force was to further study spam and to report back on whether further or modified legislation was needed to further curb the

ORDER – 11

abuses that CEMA was enacted to address.  *Id.* at 24; *see also id.* at 82-86 (House Bill Report on ESHB 2752).  The report (*id.* at 57-81) describes the statute as prohibiting subject lines that misrepresent "what the true subject of the message is":

> **What's Illegal?**
>
> The Legislature passed ESHB 2752, and Governor signed it into law as chapter 149, laws of 1998. . . . [A] violation occurs when a sender:
>
> - Misrepresents any information in identifying the point of origin or transmission path of a message (false header);
> - Puts false or misleading information on the subject line (false subject line); or
> - Uses a third party's email address (domain name) without permission.
>
> In other words, it is unlawful to misrepresent who is really sending the message, where message is actually originating, or what the true subject of the message is.

*Id.* at 62.  SLT notes that the description of "What's Illegal" does not include general false advertising, but is limited to fraud about the origin of the message and "what the true subject of the message is."

Mr. Chen's primary rebuttal argument is that if the legislature wanted to limit the scope of subsection (b) it would have included limiting language.  *See* Dkt. #10 at 20–22.  Mr. Chen does not identify any legislative history supporting its interpretation of CEMA.  "[I]f an act is subject to two interpretations, that which best advances the legislative purpose should be adopted." *In re R.*, 97 Wn.2d 182, 187, 641 P.2d 704 (1982); *see also Rest. Dev., Inc. v. Cananwill, Inc.*, 150 Wn.2d 674, 682 (2003) ("If a statute is subject to more than one reasonable interpretation, this court may look to the legislative history of the statute and the circumstances surrounding its enactment to determine legislative intent."); *Anderson v. Morris*, 87 Wn.2d 706, 716, 80 P.3d 598 (1976) ("In addition, if alternative interpretations are possible, the one that best advances the overall legislative purpose should be adopted.").  Here, the Court finds that between Mr. Chen and SLT's interpretations of CEMA, the statute's legislative history supports

1  SLT's position that the goal of CEMA was to ensure that subject lines were not concealing the

2  commercial nature of an email.

3       The Court finds that CEMA's statutory text combined with the statute's legislative history

4  and Washington caselaw supports SLT's interpretation that subsection (b) in CEMA *does not*

5  prohibit false and misleading information in an email's subject line as to *every* line of the email—

6  subsection (b) specifically prohibits false and misleading information as to the nature of the

7  email, i.e. that the email is an advertisement.  Mr. Chen's FAC does not allege that Sur La Table's

8  signature lines concealed the commercial nature of their emails.  *See generally* Dkt. #1-2.  As a

9  result, Mr. Chen fails to state a CEMA claim, and his claim must be dismissed.

10      SLT also points to the Washington Attorney's General's ("AG") website:

11  https://www.atg.wa.gov/washingtons-law.  There, SLT argues the AG makes clear that a subject

12  line is false and misleading within the meaning of the statute if it disguises the commercial

13  nature of the email.  SLT also points to *State v. Khuri*, an action filed by the AG in January 1999,

14  shortly after CEMA went into effect, where the AG asserted violations where the subject lines

15  obscured the commercial content of the email.  *See* Dkt. #8-1, Ex. B, *Khuri* Complaint, ¶¶ 4.1-

16  4.6.  SLT argues that the AG's description of the subject line prohibitions in CEMA as consistent

17  with their interpretation.  However, as Mr. Chen argues, neither of these are official opinions by

18  the AG and therefore, the Court does not give them any weight in its analysis.

19      Finally, SLT points to other states' similar, and in some cases identical, antispam laws

20  which support its interpretation.  *See* Dkt. #8 at 15–18.  Mr. Chen does not identify any other

21  state's antispam law that supports his interpretation of CEMA, but instead argues that other

22  states' statutes are irrelevant for interpreting CEMA as the Washington legislature did not use

23  those laws when drafting its own.  Dkt. #10 at 23 (citing *Perez-Farias v. Glob. Horizons, Inc.*,

24  175 Wash. 2d 518, 529 (2012)).  The Court agrees, but its conclusion remains the same.

ORDER – 13

Because the Court finds that SLT's interpretation of subsection (b) of CEMA—that it applies only to email subject lines that are false or misleading as to the commercial nature of the email—is a reasonable interpretation of the statute based on its plain language and supported by the statute's context, legislative history and caselaw, it need not reach the issue of preemption. The Court therefore also need not address Mr. Chen's surreply. Dkt. #12.

## C. Washington's Consumer Protection Act Claim

To prevail on a CPA claim, a private plaintiff must show: "(1) an unfair or deceptive act or practice, (2) that occurs in trade or commerce, (3) a public interest, (4) injury to the plaintiff in his or her business or property, and (5) a causal link between the unfair or deceptive act and the injury suffered." *Indoor Billboard/Washington, Inc. v. Integra Telecom of Washington, Inc.*, 162 Wash.2d 59, 75, 170 P.3d 10 (2007) (internal citations omitted). A private plaintiff must satisfy all five elements to prevail. *Id.* Under RCW 19.190.030(1), it is a violation of the Washington CPA to violate RCW 19.190.020.

Mr. Chen's CPA claim is based upon a violation of CEMA. Dkt. #1. For the reasons stated above, the Court finds that Mr. Chen has failed to state a CEMA claim. Accordingly, his CPA claim should also be dismissed.

## D. Leave to Amend

A "court should freely give leave [to amend] when justice so requires," Fed. R. Civ. P. 15(a)(2). Courts apply this policy with "extreme liberality." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003). Five factors are commonly used to assess the propriety of granting leave to amend: (1) bad faith, (2) undue delay, (3) prejudice to the opposing party, (4) futility of amendment, and (5) whether plaintiff has previously amended the complaint. *Allen v. City of Beverly Hills*, 911 F.2d 367, 373 (9th Cir. 1990); *Foman v. Davis*, 371 U.S. 178, 182 (1962). In conducting this five-factor analysis, the court must grant all inferences in favor of

allowing amendment. *Griggs v. Pace Am. Group, Inc.*, 170 F.3d 877, 880 (9th Cir. 1999).   In addition, the court must be mindful of the fact that, for each of these factors, the party opposing amendment has the burden of showing that amendment is not warranted. *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 187 (9th Cir. 1987); *see also Richardson v. United States*, 841 F.2d 993, 999 (9th Cir. 1988).

The Court finds that the above deficiencies with the Complaint can possibly be cured by amendment.   There has been no evidence of undue delay or bad faith.   SLT has not shown an amendment would be futile.   Prejudice to SLT if amendment is permitted will be minimal.   Weighing all of the above factors, leave to amend will be granted.

## IV.        CONCLUSION

Having reviewed the relevant pleadings and the remainder of the record, the Court hereby finds and ORDERS that SLT's Motion to Dismiss, Dkt. #8, is GRANTED.   Plaintiff's claims against the four moving Defendants are DISMISSED with leave to amend.   Plaintiff shall have thirty (30) days to file an amended complaint.   If Plaintiff fails to do so, SLT Holdco, Inc., SLT Lending SPV, Inc., SLT IP Holdings, LP, and CSC Generation Holdings, Inc. will be removed as defendants in this case.

DATED this 8th day of February, 2023.


RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE

ORDER – 15